WILLIAM S. FREEMAN (SBN 82002)
wfreeman@aclunc.org
JOHN THOMAS H. DO (SBN 285075)
jdo@aclunc.org
LARISSA GRIJALVA (SBN 352930)
lgrijalva@aclunc.org
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN
CALIFORNIA
39 Drumm Street
San Francisco, CA 94111
Telephone: (415) 621-2493
Facsimile: (415) 255-8437

JUSTIN O. MILLIGAN (SBN 228960)
jmilligan@legalaidsc.com
SUNNY NOH (SBN 344804)
snoh@legalaidsc.com
LEGAL AID OF SONOMA COUNTY
144 South E Street, Suite 100
Santa Rosa, CA 95404
Tel: (707) 542-1290
Fax: (707) 542-0177

THOMAS ZITO (SBN 304629)
tzito@dralegal.org
SEAN BETOULIERE (SBN 308645)
sbetouliere@dralegal.org
JAMEELAH NAJIEB (SBN 349644)
jnajieb@dralegal.org
DISABILITY RIGHTS ADVOCATES
2001 Center Street, 3rd Floor
Berkeley, California 94704
Tel: (510) 665-8644
Fax: (510) 665-8511

JEFFERY HOFFMAN (SBN 118768)
jhoffman@crla.org
ALICIA ROMAN (SBN 260101)
aroman@crla.org
CALIFORNIA RURAL LEGAL
ASSISTANCE, INC.
1160 N. Dutton Ave, Suite 105
Santa Rosa, California 95401
Tel: (707) 528-9941
Fax: (707) 528-0125

*Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

| | |
|---|---|
| DAVID ALLEN YESUE, MICHAEL W. DEEGAN, PAIGE ELIGHTZA CORLEY, JESSICA MARIE WETCH, and SONOMA COUNTY ACTS OF KINDNESS,<br><br>Plaintiffs,<br><br>v.<br><br>CITY OF SEBASTOPOL,<br><br>Defendant. | Case No. 4:22-cv-06474-KAW<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: September 5, 2024<br>Time: 1:30 p.m.<br>Judge: Hon. Kandis A. Westmore |

## **Table of Contents**

I.   Introduction ........................................................................................................ 1

II.   Principal city officials cited in statement of undisputed material facts ............................. 3

III.   Plaintiffs' statement of undisputed material facts ........................................................ 4

    A.   The City's residents and merchants have long opposed the presence of people living in vehicles ................................................................................. 4

    B.   The City decided to use parking regulations to address the "issue" of people living in vehicles, despite knowing that targeting unhoused people in this way was unlawful. ................................................................................. 6

    C.   The City acknowledged that the HHV Ordinance was enacted to target vehicularly housed persons ................................................................. 7

    D.   Multiple provisions of the HHV Ordinance are vague. ........................................ 9

        1.   "*Recreational Vehicle*" has no agreed meaning............................................ 9

        2.   Tying the legality of parking to *zoning* designations makes the HHV Ordinance incomprehensible. ......................................................... 10

        3.   Prohibition of "parking … *on* any park, square, or alley" is subject to differing interpretations and contradicts the provision allowing overnight parking on "streets zoned … community facility." ................................. 12

        4.   The exception to the HHV Ordinance which allows parking in City-owned lots while on "City-related business" is subject to conflicting interpretations. ................................................................................. 13

    E.   Sebastopol Police promise to engage in discriminatory enforcement. ................ 14

IV.   Summary Judgment Standard ................................................................................ 14

V.   Argument .......................................................................................................... 15

    A.   The HHV Ordinance is void for vagueness. ......................................................... 15

        1.   The Ordinance fails to inform ordinary people of the conduct it prohibits ......................................................................................... 15

            a.   Uncertain meaning of "Recreational Vehicle." ........................... 16

            b.   Uncertain meaning of how a street is "zoned."............................. 17

            c.   Uncertain meaning of parking "on a park, square, or alley." ................................................................................. 18

d.    Uncertain meaning of "city-related business." ............................. 18

2.    The Ordinance authorizes and encourages discriminatory enforcement .. 19

B.    The HHV Ordinance violates the Equal Protection Clause of the Fourteenth Amendment ....................................................................................................... 20

VI.    Conclusion ...................................................................................................................... 23

1

# TABLE OF AUTHORITIES

2

**Cases**                                                                    **Page(s)**

3

*Anderson v. Liberty Lobby, Inc.,*
4
    477 U.S. 242 (1986)..................................................................................... 14, 15

5

*City of Chicago v. Morales,*
    527 U.S. 41 (1999)..................................................................................... 15, 19

6

*City of Cleburne, Tex. v. Cleburne Living Ctr.,*
7
    473 U.S. 432 (1985)................................................................................... 20, 21

8

*City of Grants Pass v. Johnson,*
9
    No. 23-175, 2024 WL 3208072, (U.S. June 28, 2024) .......................................... 2

10

*Coates v. City of Cincinnati,*
    402 U.S. 611 (1971) ......................................................................................... 19

11

*Desertrain v. City of Los Angeles,*
12
    754 F.3d 1147 (9th Cir. 2014) ................................................................... 6, 15, 16

13

*F. S. Royster Guano Co. v. Commonwealth of Virginia,*
14
    253 U.S. 412 (1920)........................................................................................... 20

15

*Forbes v. Napolitano,*
    236 F.3d 1009 (9th Cir. 2000) ........................................................................... 16

16

*Giaccio v. State of Pa.,*
17
    382 U.S. 399 (1966)........................................................................................... 15

18

*Kolender v. Lawson,*
19
    461 U.S. 352 (1983)..................................................................................... 15, 16

20

*Lanzetta v. State of N. J.,*
    306 U.S. 451 (1939)..................................................................................... 15, 19

21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
22
    475 U.S. 574 (1986)........................................................................................... 15

23

*Oyama v. California,*
    332 U.S. 633 (1948)........................................................................................... 20

24

*Palmore v. Sidoti,*
25
    466 U.S. 429 (1984)........................................................................................... 22

26

*Papachristou v. City of Jacksonville,*
27
    405 U.S. 156 (1972)........................................................................................... 19

28

*Plyler v. Doe,*
    457 U.S. 202 (1982)..................................................................................... 20, 21

*S. Cal. Gas Co. v. City of Santa Ana,*
    336 F.3d 885 (9th Cir. 2003) ........................................................................ 14

*Skilling v. United States,*
    561 U.S. 358 (2010)....................................................................................... 15

*U.S. Dep't of Agriculture v. Moreno,*
    413 U.S. 528 (1973)....................................................................................... 20

*Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.,*
    455 U.S. 489 (1982)....................................................................................... 16

*Winters v. New York,*
    333 U.S. 507 (1948)....................................................................................... 19

*Zobel v. Williams,*
    457 U.S. 55 (1982)......................................................................................... 21

**Statutes**                                                                                    **Page(s)**

U.S. Const. amend. XIV, § 1 ................................................................................. 15

**Rules**                                                                                        **Page(s)**

Fed. R. Civ. P. 56................................................................................................. 14

**<u>NOTICE OF MOTION AND MOTION</u>**

To Defendant City of Sebastopol ("City") and its attorneys of record:

PLEASE TAKE NOTICE that on September 5, 2024, at 1:30 p.m., at a hearing accessible at https://www.cand.uscourts.gov/judges/westmore-kandis-a-kaw/, Plaintiffs will, and hereby do, move for partial summary judgment in their favor in this action, and an order declaring invalid and enjoining enforcement of Chapter 10.76 of the Sebastopol Municipal Code ("RV Parking Ordinance," or "Ordinance"), on the following grounds:

1.      Under Plaintiffs' Seventh Claim for Relief (violation of the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution) because the Ordinance is void for vagueness.

2.      Under Plaintiffs' Fourth Claim for Relief (violation of the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution) because the Ordinance is rooted in antipathy toward a politically unpopular group and is not substantially related to a legitimate governmental interest.

This motion is based on this Notice, Motion, and Memorandum; the concurrently filed Declaration of Larissa Grijalva ("Grijalva Decl.") and exhibits thereto; the papers on file in this action; and any oral argument this Court permits.

**<u>MEMORANDUM OF POINTS AND AUTHORITIES</u>**

**I.    INTRODUCTION**

After years of outcry from merchants and housed residents, the Sebastopol, California City Council enacted a so-called "RV Parking Ordinance" ("Ordinance" or "HHV Ordinance") in February 2022, achieving its goal to make it impossible for vehicularly housed people to reside in the City. In enacting this Ordinance, City leaders sought to "solve" the "problem" of people living in vehicles by making parking of these vehicles so risky that they would voluntarily leave town. As a result, Plaintiffs and other vehicularly housed residents of Sebastopol were effectively banished from the City, or placed in a state of perpetual fear and precarity—which was the City's admitted intent.

The Ordinance, enacted as Sebastopol Ordinance No. 1136 and codified at Chapter 10.76

of the Sebastopol Municipal Code, broadly prohibits the parking of "recreational vehicles;" but it is not limited to the types of vehicles that would be commonly considered RVs, because the Ordinance defines the term "recreational vehicle" to include any "vehicle or trailer … *designed or altered for human habitation* for recreational, emergency, or other human occupancy." *See* Grijalva Decl., Ex. 22[1] (Ordinance as enacted) and Ex. 9 (as codified), § 10.76.030 (emphasis added). As will be shown below, the Ordinance can be used to target people occupying any vehicles—including sedans—that an officer discretionarily decides has been designed or *is being used* for human habitation. For this reason, Plaintiffs refer to the targeted vehicles as "human habitation vehicles" ("HHVs") and to the Ordinance as the "HHV Ordinance."

As set forth in Plaintiffs' Seventh and Fourth Claims for Relief (Compl., Dkt. No. 1, ¶¶ 23-24 and 21-22) the HHV Ordinance violates two separate Constitutional protections.[2]

First, it is void for vagueness, in violation of the Due Process Clause of the Fourteenth Amendment. Each of the key terms bolded below lacks clear definition and is the subject of confusion and disagreement among City officials:

"A. It is unlawful for a person to park or leave standing any **recreational vehicle** on any public street in the city that is **zoned residential** at any time.

B. It is unlawful for a person to park or leave standing any **recreational vehicle** on any public street in the city that is **zoned commercial, industrial, or community facility** at any time between the hours of 7:30 a.m. and 10:00 p.m.

C. It is unlawful for a person to park or leave standing any **recreational vehicle on any park, square**, or alley at any time.

---

[1] All exhibits referenced in this brief are exhibits to the concurrently filed Grijalva Declaration. Hereafter, exhibits are referred to simply as "Ex. _."

[2] The claims discussed in this motion are not affected by the recent Supreme Court decision in *City of Grants Pass v. Johnson*, No. 23-175, 2024 WL 3208072, (U.S. June 28, 2024). There, the Court held only that generally applicable laws regulating camping on public property are not invalidated by the Eighth Amendment. The majority opinion noted that "[t]he Equal Protection Clause of the Fourteenth Amendment prevents governments from adopting laws that invidiously discriminate between persons," *Id.* at *10. The dissent properly noted that the Court did not address any of a number of other potential constitutional challenges, and that it had not disturbed prior holdings that vagrancy laws may be "unconstitutionally vague." *Id.* at *32-*34 (citations omitted).

D. It is unlawful for a person to park or leave standing any **recreational vehicle** in any city-owned parking lot at any time unless that person is conducting **city-related business** during business hours at the location for which the parking lot is designated."

Exs. 9 and 22, §§ 10.76.040(A)-(D). As a result, people of ordinary intelligence seeking to park certain kinds of vehicles in Sebastopol cannot know what conduct is or is not permissible. The potential consequences of such vagueness are severe, as penalties for a *first offense* include citation and immediate towing of a person's home. *Id.* at § 10.76.080. To make matters worse, successive Chiefs of Police have openly confirmed that they will enforce the Ordinance in a discriminatory fashion—against people who live in their vehicles, but not against those who park *the same types of vehicles* in the same locations, but who do not live in them.

Second, the Ordinance violates the Equal Protection Clause of the Fourteenth Amendment because it was designed to target a politically unpopular group, which is never a legitimate governmental interest. Plaintiffs have uncovered overwhelming evidence that the real purpose of the Ordinance was to target vehicularly housed persons, and that the proffered "parking availability" purpose was entirely pretextual.

Based on the undisputed facts, no reasonable factfinder could fail to find that the HHV Ordinance violates the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment. Plaintiffs seek an order granting partial summary judgment on these claims, and the issuance of the [Proposed] Order enjoining enforcement of the Ordinance.

## II.    PRINCIPAL CITY OFFICIALS CITED IN STATEMENT OF UNDISPUTED MATERIAL FACTS

During the discovery phase of this case, Plaintiffs reviewed thousands of pages of documents produced by the City; reviewed detailed minutes of years of City Council meetings; and took the depositions of principal City officials involved in the development, drafting, and enforcement of the HHV Ordinance. As an aid to the reader of this motion, here are the City officials referenced in this memorandum.

- **City Attorney and City Manager Lawrence McLaughlin.** As of the date of his deposition in February 2024, had served as City Attorney for 37 years; resigned as

City Manager in January 2024. Ex. 1, McLaughlin Dep. 8:6-17.[3]

- **Chief of Police Kevin Kilgore.** Served as Chief from February 2021 until August 2022. Ex. 6, Kilgore Dep. 9:20-24, 120:16-17. He drafted the HHV Ordinance. *Id.* at 23:22-25.

- **Chief of Police James Conner.** Preceded Chief Kilgore. Exs. 18; 26 (memos to City Council and the Mayor).

- **Chief of Police Ronald Nelson.** Current Chief; has served since September 2022. Ex. 5, Nelson Dep. 7:21-8:4.

- **Police Officer Michelle Beckman.** Community Services and Evidence Technician, responsible for enforcement of parking ordinances, including determining whether a vehicle is an "RV" under the Ordinance. Ex. 4, Beckman Dep. 15:2-4, 26:21-24.

- **Mayor Diana Rich.** Has served as Mayor since December 2023. Ex. 2, Rich Dep. 11:17-22.

## III.   PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS

### A.   The City's residents and merchants have long opposed the presence of people living in vehicles.

1.   For a number of years, Sebastopol residents frequently expressed to City leaders their opposition to the presence of people living in vehicles in their neighborhoods. Ex. 6, Kilgore Dep. 16:5-20 ("general tenor of public sentiment … regarding homelessness" was one of "extreme frustration by residents, business owners and those who used the area recreationally"); Ex. 26, 9/18/18 Staff Report by Chief Conner, at COS29310 (residents complaining about "the negative impact on neighborhood aesthetics" of "over-sized vehicles parked within residential neighborhoods"); Ex. 1, McLaughlin Dep. 93:7-9 (fact that "people were living in RVs close to people in private homes" constituted a "public nuisance"); Ex. 5, Nelson Dep. 38:20-23 (Chief of Police admits that "the citizens of Sebastopol [have] made it known that they would prefer not to

---

[3] Hereafter, deposition transcript references are shown thus: "[Name] Dep." followed by page and line numbers.

have lived-in vehicles … parking in town"); *Id.* at 22:20-22 (parking of HHVs in residential

neighborhoods "causes a lot of angst and frustration for people who reside in those homes or

own those homes…. People don't like looking out their window and seeing it, frankly."); Ex. 1,

McLaughlin Dep. 93:17-20 ("one of the problems was that the concentration of vehicles on

Morris Street was expanding into residential neighborhoods.")

     2.    Local merchants also made "a lot of complaints" about people living in RVs

nearby. Ex. 5, Nelson Dep. 19:23-24 and 41:4-7; Ex. 14, 1/18/22 memo by Committee for the

Unhoused, at COS0011347 (merchants' complaints rooted in their concern over the possible

impact of "the RV presence" on "their business opportunities and on their revenue.")

     3.    City leaders were aware of the general atmosphere of antipathy toward unhoused

people. Ex. 5, Nelson Dep. 62:3-11 (It "wouldn't surprise" him if there was harassment of

unhoused people in town because "[t]here are people who lack empathy and compassion and

have an unhealthy feeling towards unhoused people. They don't like them. They don't want them

in town."); Ex. 2, Rich Dep. 243:3-6 (Mayor acknowledges "an escalating tone of accusation [in

the public] that seemed to be directed at the people who were in their lived-in vehicles on Morris

[Street]."); *id.* at 53:1-19 and 54:10-20 (Rich was "definitely" aware of reports of "aggressive

acts" against unhoused people, including being yelled at and made to feel threatened.)

     4.    Former Mayor Patrick Slater acknowledged that "the root" of the issue giving rise

to consideration of the HHV Ordinance was "complaints about people residing in RVs," which

was based on "a visceral uncomfortableness of the unknown … that exists for an awful lot of

people." Ex. 15, 12/21/21 City Council meeting minutes ("CC minutes"), at COS98474.[4]

     5.    This "visceral uncomfortableness" manifested itself in generalized complaints

about the presence of unhoused people. Ex. 16, 2/15/21 email from Rich, at COS0029121; Ex. 2,

---

[4] Sebastopol City Council meetings are recorded on video. Ex. 1, McLaughlin Dep. 39:23-40:3.
Detailed minutes are created by Assistant City Clerk Mary Gourley and recite speakers' words
verbatim; the City's witnesses agree that they are "extremely accurate." (*Id.*, 40:24-41:4; *see
also,* Ex. 2, Rich Dep. 251:10-15 ("… she did it accurately"); Ex. 6, Kilgore Dep. 87:24-88:1
("quite accurate"). City Attorney/City Manager McLauglin reviewed all minutes for accuracy
before they were placed on the consent calendar for approval at the following meeting, and all
City Council members had an opportunity to review them. Ex. 1, McLaughlin Dep. 40:16-23;
Ex. 2, Rich Dep. 251:16-22.

Rich Dep. 222:10-17 and 224:1-4 (complaint by merchant to Mayor Rich of witnessing "general scary conduct" and "people just hanging around the businesses at odd hours with no apparent purpose").

6.      These community complaints were not supported by evidence of any actual criminal conduct. Although the Sebastopol Police Department adopted a special code to track incidents that were "transient related," the Police Department never established or even suggested any correlation between homelessness and crime. Ex. 17, 8/13/21 memo from Chief Kilgore (establishing new code for "transient related" incidents); Ex. 6, Kilgore Dep. 71:10-13 and 72:1-17 (Kilgore unable to recall a single instance of alleged crime having been committed by a person living in a vehicle, or any prosecutions or convictions); *id.* at 84:12-85:3 (Kilgore unable to make any correlation between the presence of unhoused people and criminal activity); Ex. 5, Nelson Dep. 54:13-55:2 (Chief Nelson concedes "the evidence isn't supporting the outcry …. It's difficult to make the nexus [between homelessness and criminal activity].")

**B.      The City decided to use parking regulations to address the "issue" of people living in vehicles, despite knowing that targeting unhoused people in this way was unlawful.**

7.      For a number of years prior to enactment of the HHV Ordinance in February 2022, the Sebastopol City Council discussed the "ongoing issue" of people living in vehicles in the City, principally on or near Morris Street, a non-residential street adjacent to a commercial center known as The Barlow. Ex. 6, Kilgore Dep. 15:19-16:2.

8.      Although the City acknowledged that RVs and trailers were "legally parking" on and around Morris Street, it was receiving "a number of complaints from community members and business representatives" regarding the existence of these vehicles in the area. Ex. 18, 7/17/18 memo from Chief Conner to City Council, at COS0029364.

9.      The City knew that its existing ordinance prohibiting living in a vehicle was unenforceable because it was "functionally equivalent" to a Los Angeles ordinance that the Ninth Circuit had ruled in 2014 was "unconstitutionally vague and therefore unenforceable."[5] *Id.*

---

[5] This is clearly a reference to *Desertrain v. City of Los Angeles*, 754 F.3d 1147, 1155 (9th Cir.

10.     The City also knew that it could not "selectively enforce enacted regulations to target specific class of people, thereby criminalizing their conduct (such as homelessness)," and that "[e]nacting parking restrictions simply to exclude otherwise lawful behavior could be seen by the Courts as capricious, and an attempt to circumvent the spirit of case law." *Id.* at COS0029366.

11.     Unable to directly prohibit vehicular residency, the City used an indirect enforcement strategy: officers "routinely visit the area looking for parking or criminal violations," and "have encountered people with warrants for their arrest and also those on probation for criminal convictions. Once identified as such by law enforcement, they generally leave the area to avoid future police contact." *Id.* at COS0029365-66.

12.     Despite knowing that it could not lawfully enact parking restrictions simply to exclude otherwise lawful behavior, in the fall of 2020 the City did precisely that, enacting a 3-hour parking limit on one side of Morris Street "to assure that long-term camping will not take place on that side of Morris St." Ex. 20, 9/1/20 CC minutes, at COS0029266 (statement by City Atorney/City Manager McLaughlin).

13.     In late 2021, a City Council committee recommended that the City "[m]ake a commitment to clearing Morris Street, and supporting *parking rule changes,* as needed, *to protect Morris Street as well as the neighborhoods from developing overnight parking problems in the future*." Ex. 21, 11/30/21 Ad Hoc Committee for Unhoused memo to City Council, at COS0000996 (emphasis added).

### C.     The City acknowledged that the HHV Ordinance was enacted to target vehicularly housed persons.

14.     The HHV Ordinance was enacted on February 23, 2022 (Ex. 22, Ordinance as enacted) and is codified at Sebastopol Municipal Code ("SMC") Chapter 10.76 (Ex. 9).

15.     The Ordinance recites two purposes: "to ensure there is adequate parking for residents of the city" and "to regulate the parking of vehicles actively used as sleeping

---

2014), in which the Ninth Circuit held that a Los Angeles ordinance regulating the use of vehicles as "living quarters." See discussion at pp. 16-17 below.

accommodations." Ex. 22, HHV Ordinance, § 10.76.020.

16.    Prior to enactment of the Ordinance, the City never undertook any survey or study of the adequacy of parking for city residents. Ex. 6, Kilgore Dep. 37:11-20 (former Police Chief could not recall any parking availability study prior to enactment); Ex. 5, Nelson Dep. 22:5-10 (current Chief could not recall any such study); Ex. 3, Weinberger Dep. 10:13-19 and 15:13-18 (outside consultant was not asked to conduct any study of parking availability until mid-2023, after this lawsuit was filed).

17.    The City admitted that adopting parking regulations to "ensure there is adequate parking" (one of the alleged purposes of the HHV Ordinance) could not be supported by facts. Ex. 26, 9/18/18 Chief Conner report to City Council, at COS0029311 ("It would be difficult to articulate a defendable reason for 2- or 3-hour Parking restrictions on Morris Street … because … there is not normally a shortage of parking space which would necessitate turnover…").

18.    By contrast, the second stated purpose of the HHV Ordinance, "to regulate the parking of vehicles actively used as sleeping accommodations," is repeatedly reflected in City Council proceedings prior to enactment. Ex. 6, Kilgore Dep. 91:19-92:1 (Kilgore understood Council's "commitment to clearing Morris Street" and "protecting the neighborhoods from developing overnight parking problems"); *id.* at 93:21-94:8 (Kilgore understood that to prevent "overnight parking problems," the Ordinance was "intended to prevent people from remaining in vehicles 24 hours a day in those areas"); Ex. 1, McLaughlin Dep. 38:20-25 and 155:15-17 (a purpose of the HHV Ordinance was "to regulate the parking of vehicles people actually slept in" and it was "designed to address habitation of vehicles"); Ex. 6, Kilgore Dep. 94:5-22 (HHV Ordinance was "intended to prevent people from remaining in vehicles 24 hours a day" and to make sure that vehicular residency was not "moved [from Morris Street] to other parts of town."); Ex. 25, 1/19/22 email from Kilgore to Haug, at COS0076991-92 (purpose of prohibition on parking in residential areas was "to deter those who do not have an actual home on a foundation with a mailing address in the City from parking RVs there"); Ex. 1, McLaughlin Dep. 58:15-19 (there was "more of a concern with regulating the parking of vehicles that people were continuously or habitually sleeping in than regulating the parking of similar vehicles that people

weren't using to sleep in.")

### D.   Multiple provisions of the HHV Ordinance are vague.

#### 1.   "*Recreational Vehicle*" has no agreed meaning.

19.   The definition of "recreational vehicle" in the Ordinance encompasses any "vehicle or trailer … designed or altered for human habitation for recreational, emergency, or other human occupancy." Exs. 9 and 22, § 10.76.030.

20.   Some City officials believe that a vehicle is only "altered for human habitation" if its structure is *permanently modified* to include sleeping quarters and a kitchen. Ex. 5, Nelson Dep. 27:5-24; Ex. 2, Rich Dep. 70:5-13 (using a sleeping bag does not "alter" a vehicle so as to make it an RV).

21.   By contrast, Chief Kilgore, who drafted the Ordinance, and City Manager/City Attorney McLaughlin maintain that the definition covers any vehicle used for sleeping, including traditional RVs and cars. Ex. 6, Kilgore Dep. 30:24-31:5 and 31:23-32:2 ("the ordinance was intended to address people living in RVs and also living in cars" and its statement of purpose "included both what people traditionally think of as RVs but also vans that people were sleeping in."); Ex. 1, McLaughlin Dep. 159:17-20 and 97:22-98:7 (concurring that "there were people who were sleeping in cars that were not what might be traditionally defined as recreational vehicles," and that the ordinance was intended to address people sleeping in cars as well as RVs); *id.* at 47:10-25 (McLaughlin, when asked, "Does the change [to a vehicle] have to be permanent?" responded, "I could argue it both ways," and that 'altered' "could even include, I suppose, changing what's loaded into the vehicle in some manner"); *id.* at 50:7-19 (a sedan that had been altered for habitation could be an "RV" within the meaning of the Ordinance; "If they were living in it, occupying it as a living space, then I would say it falls within the definition."); *id.* at 49:16-23 (Ordinance covers "utilizing a vehicle for habitation").

22.   The City has never attempted to clarify the meaning of "altered for human habitation" through either written guidance, formal policies, or training. Ex. 5, Nelson Dep. 29:7-19; Ex. 6, Kilgore Dep. 39:20-40:8; Ex. 4, Beckman Dep. 28:8-13.

////

**2.    Tying the legality of parking to *zoning* designations makes the HHV Ordinance incomprehensible.**

23.    The HHV Ordinance makes it unlawful to park an HHV *at any time* "on any public street in the city that is zoned residential," and also imposes a *daytime* (7:30 a.m. until 10:00 p.m.) prohibition against parking such vehicles "on any street that is zoned commercial, industrial, or community facility." Exs. 9 and 22, § 10.76.040(A)-(B).

24.    Reference to how a "street" is "zoned" is ambiguous because in Sebastopol, *streets* are not zoned; only *parcels of property* are zoned. Ex. 1, McLaughlin Dep. 71:5-7 and 168 (errata sheet) ("I believe our streets aren't zoned");[6] *see also, id.* at 70:3-4, 69:12-17 (McLaughlin "not sure as I sit here today" whether zoning boundaries include the streets themselves; in order to determine that, he "would have to research zoning law, and also look at our Zoning Code in its entirety"); *see also,* Ex. 10 (zoning map); Ex. 11 (legend showing zoning areas in color and streets themselves uncolored, and therefore not zoned).

25.    In addition, on a number of street segments, the property parcels on opposite sides of the street are zoned differently, making it uncertain as to whether, or when, an RV could be parked on these streets. Ex. 10; Ex. 11; Ex. 1, McLaughlin Dep. 70:19-71:3 (in such cases "I would say [how a street is zoned] depends … on where the vehicle in question is parked.")

26.    There are no signs in the city that indicate how a particular area or location is zoned. Ex. 1, McLaughlin Dep. 85:12-15.

27.    There are no signs within any residential area concerning the prohibition on RV parking there. Ex. 23, 3/23/22 Kilgore memo; Ex. 1, McLaughlin Dep. 61:19-24 (signs posted only at main roadway entrances to City because "signs are expensive, and we wanted to limit the number of signs we had to purchase").

28.    Chief Nelson conceded that "[i]f there are no signs, it would be difficult for [people living in vehicles] to know" where "they could park an RV overnight" on a given street. Ex. 5, Nelson Dep. 32:16-33:10.

29.    The City maintains a zoning map that is accessible on the internet. Ex. 1,

---

[6] In his errata sheet, Mr. McLaughlin corrected his testimony from "I believe our streets are zoned." to "I believe our streets aren't zoned."

McLaughlin Dep. 64:21-65:17; Ex. 10 (zoning map); Ex. 11 (enlargement of map legend).

30.    The zoning map does not explain whether the large area zoned "Downtown Core" is zoned residential or commercial. Ex. 6, Kilgore Dep. 47:16-48:5 (Chief Kilgore could not tell from the zoning map; he would have to consult the City Engineer); Ex. 5, Nelson Dep. 33:18-23 (Chief Nelson did not know the answer); Ex. 1, McLaughlin Dep. 67:7-68:1 (based on the City's zoning code, this zone could be *part* commercial and *part* residential; to know for sure, one "would have to be on the inside in city government.")

31.    It is also unclear to City officials whether parcels zoned "Planned Community" are residential or commercial. Ex. 8, Response to Request for Admission No. 11 ("Parcels designated as 'planned community' are not zoned either residential, commercial, industrial, or community facility."); Ex. 6, Kilgore Dep. 48:11-15 (Chief admits he doesn't know if Planned Community is a residential or commercial designation); Ex. 5, Nelson Dep. 34:4-13 (Current Chief admits he "would be guessing"); Ex. 1, McLaughlin Dep. 68:8-25 ("Planned Community" could be either commercial or residential, depending on the nature of a particular project, and it "could be a problem" figuring that out from the zoning map); *id.* at 69:1-4 (for "the person with an RV figuring out how to park… I'm not sure how you would know that").

32.    In five separate instances in sworn interrogatory responses, the City *incorrectly* asserted that overnight RV parking is legal in a particular location when in fact, it is not; Mr. McLaughlin conceded these errors in his deposition. Ex. 7, City's Second Amended Responses to Plaintiffs' Interrogatories, Set One, at 6-8; Ex. 1, McLaughlin Dep. 80:5-87:8 (specific details of each of the City's errors are listed in the footnote[7]).

_____

[7] Interrogatory No. 2 requested: "List all public streets (or portions thereof) within the CITY where HHVs can legally park between the hours of 10:00 p.m. and 7:30 a.m." Ex. 7 at 6. City Manager/City Attorney McLaughlin testified that to prepare the City's response, the City Planner "went through the city's streets one by one and … applied zoning information to come up with [a] list of actual streets." Ex. 1, McLaughlin Dep. 80:11-16. McLaughlin then "double checked" the list and confirmed that it was accurate before signing the responses under oath. *Id.* at 80:17-21. The incorrectly identified locations are: the west side of Pleasant Hill Road between Valentine Ave. and Washington Ave. (*id.* at 82:2-21); the southern side of Willow St. from Jewell Ave. east of High Street (*id.* at 82:22-83:11); the entirety of Fannen St. (*id.* at 83:12-84:3); the entirety of Barnes Ave. (*id.* at 85:16-86:10); and the entirety of Berry Lane (*id.* at 86:11-

33.     Chief Kilgore maintains that one cannot park an RV overnight adjacent to a City park because the park was located in a residential area, even though the park itself is zoned "Community Facility" and therefore overnight parking is legal there under the language of the HHV Ordinance. *See* Ex. 9, HHV Ordinance, § 10.76.040(B) (overnight parking permitted on "any street zoned …community facility"); *compare* Ex. 6, Kilgore Dep. 104:10-13 and 44:19-25 (unlawful to park overnight adjacent to Libby Park, even though the park is zoned Community Facility, because the park is located within a residential area) *with* Ex.1, McLaughlin Dep. 73:18-74:12 (overnight parking adjacent to Libby Park is lawful because one would "look to the zoning of the parcel that is adjacent to where they are attempting to park.")

> **3.     Prohibition of "parking … *on* any park, square, or alley" is subject to differing interpretations and contradicts the provision allowing overnight parking on "streets zoned … community facility."**

34.     The HHV Ordinance makes it unlawful, at any time, to park or leave standing an RV "on any park, square or alley." Exs. 9 and 22, § 10.76.040(C).

35.     City officials do not agree as to whether the prohibition of parking "on" a park or square refers only to parking on the parcel that contains the park or square, or whether it also prohibits parking on streets or parking lots adjacent to the park or square. *Compare* Ex. 6, Kilgore Dep. 42:8-15 (provision prohibits parking on to the physical plot of land only, and not on adjacent streets) *with* Ex. 1, McLaughlin Dep. 75:10-20 (prohibition of parking on City's Downtown Plaza includes the adjacent parking lot).

36.     City officials admit that there is no way for vehicle owners to know whether parking adjacent to a park or square is or is not prohibited. Ex. 1, McLaughlin Dep. 76:1-3; Ex. 2, Rich Dep. 294:23-295:23 ("I am not the expert on zoning. So, I'm not sure.").

37.     If the absolute prohibition of parking "on any park" in SMC Chapter 10.76 § 10.76.040(C) also prohibits parking on streets adjacent to a park, it contradicts SMC Chapter 10.76 § 10.76.040(B), which permits overnight parking on "any public street" that is "zoned … community facility," because Sebastopol's public parks are zoned "Community Facility." Ex. 1,

87:8).

McLaughlin Dep. 73:13-74:12; *see also,* Ex. 12; Ex. 13 (enlargements of portions of zoning map).

38.    City officials do not agree whether overnight RV parking is permitted adjacent to City parks located in residential areas. *Compare* Ex. 1, McLaughlin Dep. 74:8-20 (overnight parking would be permitted adjacent to Libby Park even though park is surrounded by residential area) *with* Ex. 2, Rich Dep. 293:13-294:11 and 289:6-8 (overnight parking would be prohibited on Willow Street, adjacent to Ives Park because "we have such a small town. We have residential areas where there's no … recreational vehicle parking.")

### 4.    The exception to the HHV Ordinance which allows parking in City-owned lots while on "City-related business" is subject to conflicting interpretations.

39.    The Ordinance makes it "unlawful for a person to park or leave standing any recreational vehicle in any City-owned parking lot at any time *unless that person is conducting City-related business during business hours.*" Exs. 9 and 22, § 10.76.040(D) (emphasis added).

40.    The City's witnesses have advanced three conflicting interpretations of the meaning of "city related business." *Compare* Ex. 5, Nelson Dep. 40:1-22 (term means conducting City business, such as reporting a crime, asking for a police report, paying off a citation, getting fingerprinted, or seeking a business permit; it does not include walking on a nearby recreational trail or going to a local movie house) *and* Ex. 1, McLaughlin Dep. at 76:11-22 (term means "municipal uses that the parking lot's designated for") *with* Ex. 2, Rich Dep. 104:19-106:13 (term also includes going shopping in the City or hiking on the Joe Rodota Trail, a local nature trail) *and* Ex. 6, Kilgore Dep. 55:15-56:11 (hiking on the Joe Rodota Trail qualifies as "City-related business" only if one limits the hike to the portion of the Trail within City limits; if one walks outside the City toward Santa Rosa, that would make parking in a City lot unlawful); *see also,* Ex. 4, Beckman Dep. 38:13-17 (Parking Enforcement officer: "I don't know exactly what they're referring to in the ordinance as being City-related business").

////

////

////

**E.    Sebastopol Police promise to engage in discriminatory enforcement.**

41.    Enforcement of the Ordinance is mostly "complaint driven," meaning that enforcement is based on complaints to police by residents. Ex. 5, Nelson Dep. 35:22-36:1.

42.    Before the Ordinance was enacted, Chief Kilgore reassured the City Council that it would only be enforced against *certain* persons who parked their RVs in town—namely, those who use them to live in. Ex. 24, 2/23/22 CC minutes (Chief Kilgore stated "[s]omebody who drives a vehicle such as a VW van that's been modified for that purpose into downtown to eat dinner is probably not going to see a whole lot of us… but if we see that vehicle that is staying in the same spot over and over again for a long period of time, then common sense kicks in that somebody is probably using that vehicle to live in, and that would be a violation of the ordinance at that point."); Ex. 6, Kilgore Dep. 34:4-17 (confirming accuracy of this statement as reflected in minutes); *id.* at 35:5-16 (Kilgore would not enforce the Ordinance against a parked vehicle that was "simply being used as a point of transportation," but would enforce it if the same vehicle was being used as a "point of habitation and not following what the ordinance intent was ….").

## IV.    SUMMARY JUDGMENT STANDARD

A moving party is entitled to summary judgment on a claim or affirmative defense—or any portion thereof—if "there is no genuine dispute as to any material fact" and they are "entitled to judgment as a matter of law." Fed. R. Civ. P. 56. To meet its initial burden of production on summary judgment, a moving party need only present evidence to support prima facie showing that there is no genuine dispute as to any fact material to a claim, or that one or more elements of an affirmative defense asserted by the opposing party cannot be established. *See S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003).

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A material fact is one "that might affect the outcome of the suit under the governing law …. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at

248. To establish a genuine dispute sufficient to warrant trial on a claim or defense, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the evidence offered in support of an alleged factual dispute is "merely colorable" or "not significantly probative," summary judgment is appropriate. *Anderson*, 477 U.S. at 249-50.

## V.    ARGUMENT

### A.    The HHV Ordinance is void for vagueness.

The Due Process Clause of the Fourteenth Amendment commands that no state shall "deprive any person of life, liberty, or property, without due process of law…." U.S. Const. amend. XIV, § 1. Under the Due Process Clause, "[v]agueness may invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind of notice that will enable ordinary people to understand what conduct it prohibits; second, it may authorize and even encourage arbitrary and discriminatory enforcement." *Desertrain*, 754 F.3d at 1155, *quoting City of Chicago v. Morales*, 527 U.S. 41, 56 (1999).

### 1.    The Ordinance fails to inform ordinary people of the conduct it prohibits.

An ordinance fails "if it is so vague and standardless that it leaves the public uncertain as to the conduct it prohibits." *Desertrain*, 754 F.3d at 1155, *quoting Giaccio v. State of Pa.*, 382 U.S. 399, 402 (1966). "As generally stated, the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *see also, Skilling v. United States*, 561 U.S. 358, 402-03 (2010). "The purpose of the fair notice requirement is to enable the ordinary citizen to conform his or her conduct to the law. 'No one may be required at the peril of life, liberty or property to speculate as to the meaning of penal statutes.'" *Morales*, 527 U.S. at 58, *quoting Lanzetta v. State of N. J.*, 306 U.S. 451, 453 (1939). Where "such minimal guidelines" are not provided, a statute may permit 'a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections.'" *Skilling,* 561 U.S. at

403, *quoting Kolender*, 461 U.S. at 358.

In *Desertrain*, the Ninth Circuit invalidated for vagueness a Los Angeles ordinance that made it unlawful to "use a vehicle parked or standing upon any City street … as living quarters, either overnight, day-by-day, or otherwise." *Desertrain*, 754 F.3d at 1155. The court found that it was impossible for the plaintiffs there to know whether engaging in "otherwise perfectly legal" behavior in a vehicle, such as eating, keeping a sleeping bag, canned food or books, or talking on a cell phone, would subject them to citation and arrest, leaving them no choice "short of discarding all of their possessions or their vehicles, or leaving Los Angeles entirely." *Id.* at 1156.[8]

In *Forbes v. Napolitano*, 236 F.3d 1009 (9th Cir. 2000), the Ninth Circuit invalidated for vagueness a statute criminalizing medical uses of fetal tissue from induced abortions because three of the statute's critical terms – "experimentation," "investigation," and "routine" – were ambiguous and were not defined. The Court held that the statute "gives doctors no constructive notice, and gives police, prosecutors, juries and judges no standards to focus the statute's reach." *Forbes*, 236 F.3d at 1013.

Similarly here, many of the Ordinance's key terms are incurably vague. This is conclusively proven by the words of the City officials responsible for drafting, enacting, and enforcing the Ordinance. These officials cannot agree on what the terms mean. In some cases, they frankly admit that they do not know what they mean, notwithstanding their experience, specialized knowledge, and access to resources that are unavailable to someone who is trying to figure out where they can park. If these people cannot agree, there can be no doubt that an "ordinary person" would be unable to understand what conduct is prohibited.

### a.    Uncertain meaning of "Recreational Vehicle."

The current Chief of Police and Mayor believe that a vehicle is only an RV if it has been

---

[8] Because this is a "facial" challenge, the Court would be required to consider any limiting construction that had been proffered by an enforcement agency. *Village of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.5 (1982). Here, as in *Desertrain*, the Police Department never issued any guidance as to any of the Ordinance's ambiguous terms, and never conducted any training about them. *See* Section III, Statement of Undisputed Material Facts ("UF") ¶ 22; *See Desertrain*, 754 F.3d at 1157.

*permanently* modified to accommodate sleeping quarters and a kitchen. *See* Section III, Statement of Undisputed Material Facts ("UF") ¶ 20 (testimony of Chief Nelson and Mayor Rich). Yet both the Chief of Police who drafted the Ordinance and the City Attorney/City Manager contend that the Ordinance covers *both cars and vans* so long as people are living or sleeping in them. UF ¶ 21 (testimony of Chief Kilgore and McLaughlin). There is disagreement as to whether a vehicle is "altered for human habitation" by placing a sleeping bag in it. *Compare* UF ¶ 20 (Mayor Rich says using a sleeping bag does not "alter" a vehicle) *with* UF ¶ 21 (City Attorney/City Manager Mclaughlin says "altered" could mean "changing what's loaded into the vehicle," and Ordinance covers any vehicle if people are "living in it, occupying it as a living space.") These officials would enforce the Ordinance according to what they contend is its underlying purpose "to regulate the parking of vehicles people actually slept in" and prevent "habitation of vehicles" of any kind by "people who do not have an actual home on a foundation." UF ¶ 18. Tellingly, Mr. McLaughlin admitted that he "could argue it both ways." UF ¶ 21. As a result, a person who needs to use a vehicle to sleep in cannot be sure whether their vehicle is covered by the Ordinance's prohibitions.

### b.    Uncertain meaning of how a street is "zoned."

Because the Ordinance's prohibitions are tied to how a *street* is *zoned* (UF ¶ 23), it is unintelligible because the City Attorney/City Manager has admitted under oath that "*our streets aren't zoned*." UF ¶ 24 (emphasis added). This ambiguity cannot be resolved by knowing the zoning of adjacent properties, because many streets have properties that are differently zoned on opposite sides; in such cases, according to Mr. McLaughlin, whether parking is permitted depends on *what side of the street* the vehicle is parked on (UF ¶ 25)—but the Ordinance does not say that. Because there are no street signs indicating how a particular location is zoned, and no signs in residential areas stating that RV parking is prohibited (UF ¶¶ 26-27), Chief Nelson concedes that it is "difficult" for a person living in a vehicle to know where they can park overnight (UF ¶ 28). Even though the City publishes a zoning map on the internet (UF ¶ 29), that map does not explain whether large swaths of the City designated "Downtown Core" and "Planned Community" are zoned, making it impossible to know whether daytime parking there

is lawful (UF ¶¶ 30-31). Mr. Kilgore, Mr. McLaughlin, and Mayor Rich do not agree whether it is lawful to park overnight adjacent to a park zoned "Community Facility" that is surrounded by parcels zoned residential. UF ¶¶ 33, 38. Ultimately, Mr. McLaughlin had to concede that it "could be a problem" figuring where to park from the zoning map if one was not "on the inside in city government." UF ¶¶ 30-31. As if to confirm this, on five separate occasions in sworn interrogatory responses, he mistakenly claimed overnight parking would be lawful in a particular location, only to have to admit in his deposition that it would not be. UF ¶ 32.

### c.   Uncertain meaning of parking "on a park, square, or alley."

City officials also disagree on whether the Ordinance's prohibition against overnight parking "on" a park or square refers to only the physical property that is the park or square, or whether it extends to adjacent streets and parking lots. UF ¶¶ 34-35. Mayor Rich candidly admitted that she was "not sure" because she is "not the expert on zoning." UF ¶¶ 36. But if the prohibition extends to adjacent streets, it conflicts with the provision of the Ordinance purporting to allow overnight parking on streets "zoned community facility," because that is the way the City's parks are zoned. UF ¶ 37. Not surprisingly, officials cannot agree as to whether overnight parking adjacent to parks located within residential areas is permitted. UF ¶ 38. Here too, vehicle dwellers are left to wonder whether they will be cited or towed if they park overnight adjacent to such locations. One should not have to be an "expert on zoning" or "on the inside in City government" to know where one can safely park.

### d.   Uncertain meaning of "city-related business."

Finally, City leaders disagree on the meaning of the Ordinance's exception that allows parking of RVs if a person is conducting "city-related business" during business hours. UF ¶ 39. Does this exception refer narrowly to official business transacted in a City government office? Does it extend to shopping in a store within City limits? Does it include recreational hiking? And if so, what if the hiker follows the recreational trail outside City limits? Two police chiefs, the Mayor, the City Attorney/City Manager, and the principal traffic enforcement officer cannot agree. UF 40. Quite clearly there is no way for a vehicle dweller to know.

////

### 2.     The Ordinance authorizes and encourages discriminatory enforcement.

With regard to the second "independent reason" cited in *Desertrain* and *Morales*, the Supreme Court has long recognized that local laws directed against "undesirable" persons or conduct in vague terms "allow the net to be cast at large, to enable men to be caught who are vaguely undesirable in the eyes of police or prosecution…" *Winters v. New York*, 333 U.S. 507, 540 (1948) (Frankfurter, J., dissenting, discussing *Lanzetta*, 306 U.S., *supra*). Thus, in *Papachristou v. City of Jacksonville*, 405 U.S. 156 (1972), the Court struck down a local ordinance punishing persons deemed "vagrants," the definition of which included "rogues and vagabonds," "persons wandering or strolling about from place to place without any lawful purpose or object," and "habitual loafers." *Id.* at n.1. In *Morales,* the Supreme Court struck down a statute that prohibited "criminal street gang members" from "loitering," which was described as "remain[ing] in one place with no apparent purpose." *Morales*, 527 U.S. at 47.

Because the Ordinance here delegates "virtually standardless discretion" to police officers, it is "invalid in all its applications" because "every application of the ordinance represents an exercise of unlimited discretion." *Morales*, 527 U.S. at 71 (Breyer, J., concurring in the judgment). In *Coates v. City of Cincinnati*, 402 U.S. 611 (1971)*,* the Court declared facially unconstitutional for vagueness an ordinance that prohibited persons assembled on a sidewalk from "conduct[ing] themselves in a manner annoying to persons passing by." *Coates*, 402 U.S. at 618. The Court reasoned that while conduct such as blocking sidewalks or obstructing traffic could be prohibited by ordinances "directed with reasonable specificity toward the conduct to be prohibited," the same conduct could not be prohibited through "an ordinance whose violation may entirely depend upon" the subjective judgment of a policeman. *Id.* at 614.

When the City was considering the Ordinance, one of its selling points was the fact that its vagueness would enable it to engage in arbitrary and discriminatory enforcement against disfavored persons. To begin with, enforcement of the ordinance is "complaint driven" (UF ¶ 41), meaning that police will only enforce it when residents complain; and it is obvious that residents are most likely to complain about people towards whom they have "an unhealthy feeling" (UF ¶ 3) and whose mere presence causes "visceral uncomfortableness" (UF ¶ 4). And it

is impossible to imagine a more concise statement of discriminatory intent than Chief Kilgore's

reassurance, prior to enactment, that the Ordinance would not be enforced against a person who

drives their vehicle "into downtown to eat dinner" – in other words, using the vehicle as a "point

of transportation" – but would be enforced against *the same vehicle* if a person is "using that

vehicle to live in" – in other words, as a "point of habitation." UF ¶ 42. In expressing his

priorities so starkly, Chief Kilgore made clear that the Ordinance would be used against people

whose circumstances required them to live in their vehicles, but not, as he later said, against

people who have sufficient means to afford "an actual home on a foundation." UF ¶ 18.

      For both of the independent reasons set forth in *Desertrain* and *Morales,* the HHV

Ordinance is void for vagueness.

### B.    The HHV Ordinance violates the Equal Protection Clause of the Fourteenth Amendment

      "The Equal Protection Clause of the Fourteenth Amendment requires that 'all persons

similarly circumstanced shall be treated alike.'" *Plyler v. Doe*, 457 U.S. 202, 216 (1982), *quoting*

*F. S. Royster Guano Co. v. Commonwealth of Virginia*, 253 U.S. 412, 415 (1920). The general

rule is that "legislation is presumed to be valid and will be sustained if the classification drawn

by the statute is rationally related to a legitimate state interest." *City of Cleburne, Tex. v.*

*Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). However, a government "may not rely on a

classification whose relationship to an asserted goal is so attenuated as to render the distinction

arbitrary or irrational. Furthermore, some objectives—such as 'a bare … desire to harm a

politically unpopular group'—are not legitimate state interests." *Id.* at 446, *quoting U.S. Dep't of*

*Agriculture v. Moreno*, 413 U.S. 528, 535 (1973) (striking down statute intended to prevent

"hippies" from receiving food stamps).

      Thus, where a law is admittedly aimed at a disfavored group, courts will engage in a

searching examination of government's proffered objectives and the means adopted to achieve

them; "the State must demonstrate that the classification is reasonably adapted to '*the purposes*

*for which the state desires to use it.*'" *Plyler*, 457 U.S. at 226, *quoting Oyama v. California*, 332

U.S. 633, 664-65 (1948) (Murphy, J., concurring) (emphasis original). For example, it is not

sufficient to declare that the state wishes to conserve resources by denying them to the

disfavored group; this is nothing more than "a concise statement of an intention to discriminate."

*Plyler*, 457 U.S. at 227 (striking down state law denying free public education to children of

undocumented persons); *see also, Zobel v. Williams*, 457 U.S. 55, 61-65 (1982) (invalidating

state's scheme favoring long-term residents in distribution of mineral-rights fund).

In *City of Cleburne, Tex.*, the Court struck down a local zoning ordinance that required a

special use permit to operate a facility for people with intellectual disabilities but did not require

a permit for other group living facilities, such as apartment houses, boarding houses, or a

hospital. The Court placed on the city the burden to show that its classification was justified. It

considered, and rejected, each of the city's proffered justifications: the "negative attitude" of

property owners living near the proposed facility; the fear that students at a nearby high school

would "harass" the occupants of the facility; the fact that the facility would be located in a "five

hundred year flood plain;" doubts about the city's "legal responsibility for actions which the

[residents] might take;" the size of the facility and the number of people occupying it; and

concerns about congestion, fire hazards, "serenity of the neighborhood," and "avoidance of

danger to other residents." *City of Cleburne, Tex.*, 473 U.S. at 448-50. The Court found that none

of these reasons "rationally" justified an ordinance that treated intellectually disabled people

differently from others, and concluded: "The short of it is that requiring the permit in this case

appears to us to rest on an irrational prejudice against [people with intellectual disabilities]...."

*Id.* at 450. Importantly, the Court held that just as the electorate as a whole could not enact an

ordinance violative of the Equal Protection Clause, "the City may not avoid the strictures of that

Clause by deferring to the wishes or objections of some fraction of the body politic." *Id.* at 448.

Here, the uncontested facts overwhelmingly demonstrate (1) that the Ordinance was

based on the "irrational prejudice" expressed residents and business owners, to whom the City

Council was clearly responsive,[9] and (2) the lack of any factual basis to support the only non-

---

[9] Plaintiffs do not dispute that some residents and some City Council members expressed compassion toward unhoused people. This is irrelevant to the equal protection analysis, however, in light of the discriminatory motive articulated by "some fraction of the body politic," not to mention some City officials. *City of Cleburne, Tex.*, 473 U.S. at 448.

discriminatory reason offered for it. Chiefs of Police and elected officials alike have confirmed these widespread sentiments of "extreme frustration" (UF ¶ 1), "angst and frustration" (*Id.*), "lack [of] empathy and compassion" (UF ¶ 3), and "a visceral uncomfortableness of the unknown" (UF ¶ 4), all of which led to "a lot of complaints" (UF ¶¶ 2, 5, 8) that the Police Department, despite its best efforts, was unable to correlate to criminal conduct (UF ¶ 6). In the environment created by these sentiments, the City Council set about to find ways to limit or eliminate the ability of vehicularly housed people to live in Sebastopol, even though they knew that the people they were targeting were "legally parking" (UF ¶¶ 7-8) and that their prior attempt to regulate such parking was "unconstitutionally vague and therefore unenforceable" after *Desertrain* (UF ¶¶ 9-10). After other regulations and enforcement strategies did not "solve" the "problem" (UF ¶¶ 11-12), in late 2021 the City committed to a plan to use "parking rule changes" to "clear[ ] Morris Street" and "protect … the neighborhoods from developing overnight parking problems in the future" (UF ¶ 13).

The City offered two justifications for the Ordinance – "to ensure there is adequate parking for residents of the city" and to "actively regulate" the parking of vehicles used for sleeping. UF ¶ 15. The first reason was clearly pretextual, as no one can recall any studies of parking availability (UF ¶ 16) and the Chief of Police admitted that a claimed shortage was not a "defendable reason" for parking restrictions (UF ¶ 17). The second reason was plainly the *only* reason; without exception, City officials confirmed at City Council meetings and in their depositions that it was their desire to "prevent people from remaining in vehicles 24 hours a day" and to "deter those who do not have an actual home on a foundation" from parking in the City. UF ¶ 18. The record here could not be any clearer.

Under *Plyler* and *City of Cleburne, Tex.*, the City has the affirmative burden of showing that the Ordinance furthers a legitimate governmental goal. It cannot do so, having admitted that it never even studied parking availability, and having conceded that parking restrictions could not be justified by a claimed parking shortage. These facts doom the Ordinance under Equal Protection grounds. "Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect." *Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) (reversing

child custody order premised on asserted goal to protect child from racial discrimination).

## VI. CONCLUSION

Through its RV Parking Ordinance, the City sought to do, indirectly, what the Ninth Circuit outlawed in *Desertrain* when Los Angeles did it directly: to establish a scheme by which it could arbitrarily and discriminatorily criminalize people who live in their vehicles, while allowing more "favored" City residents to park those same types of vehicles on City streets without being disturbed. The facts cited here conclusively demonstrate that the Ordinance fails both because it is void for vagueness and because it violates the Equal Protection Clause. The Court should grant partial summary judgment in favor of Plaintiffs and issue the [Proposed] Order submitted herewith, enjoining enforcement of the Ordinance.

Respectfully submitted,

Dated: July 11, 2024

*/s/ William S. Freeman*
William S. Freeman (SBN 82002)
John Thomas H. Do (SBN 285075)
Larissa Grijalva (SBN 352930)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION OF NORTHERN CALIFORNIA

*/s/ Thomas Zito*
Thomas Zito (SBN 304629)
Sean Betouliere (SBN 308645)
Jameelah Najieb (SBN 349644)
DISABILITY RIGHTS ADVOCATES

*/s/ Justin O. Milligan*
Justin O. Milligan (SBN 228960)
Sunny Noh (SBN 344804)
LEGAL AID OF SONOMA COUNTY

*/s/ Jeffery Hoffman*
Jeffery Hoffman (SBN 118768)
Alicia Roman (SBN 260101)
CALIFORNIA RURAL LEGAL ASSISTANCE,
INC.

*Attorneys for Plaintiffs*

1

## **ATTESTATION**

Pursuant to N.D. Cal. Civ. L.R. 5-1(i)(3), I certify that all signatories have concurred in the filing of this document.

Dated: July 11, 2024                                   /s/ William S. Freeman
                                                        William S. Freeman